Slip Op. 10-101

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QVD FOOD CO., LTD.,<br><br>                Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>                Defendant. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 09-00157 |

[Administrative review results sustained.]

Dated: September 1, 2010

    Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Mark E. Pardo, Andrew T. Schutz) for Plaintiff QVD Food Co., Ltd.

    Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Richard P. Schroeder); and Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (David W. Richardson), of counsel, for Defendant United States.

    Akin, Gump, Strauss, Hauer & Feld, LLP (Valerie A. Slater, Jarrod M. Goldfeder, Nicole M. D'Avanzo, Natalya D. Dobrowolsky) for Defendant-Intervenors Catfish Farmers of America, America's Catch, Consolidated Catfish Companies, LLC, d/b/a Country Select Fish, Delta Pride Catfish Inc., Harvest Select Catfish Inc., Heartland Catfish Company, Pride of the Pond, Simmons Farm Raised Catfish, Inc., and Southern Pride Catfish Company, LLC.

**OPINION**

    Gordon, Judge: This consolidated action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam. See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17, 2009) (final results admin. review), as amended, Certain

Frozen Fish Fillets from the Socialist Republic of Vietnam, 74 Fed. Reg. 17,816 (Dep't of Commerce Apr. 17, 2009) (amend. final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, A-552-801 (Mar. 9, 2009), available at http://ia.ita.doc.gov/frn/summary/vietnam/E9-5744-1.pdf (last visited Sept. 1, 2010) ("Decision Memorandum").

Before the court are motions for judgment on the agency record filed by QVD Food Co., Ltd. ("QVD"), and Catfish Farmers of America, and individual U.S. catfish processors, America's Catch, Consolidated Catfish Companies, LLC, d/b/a Country Select Fish, Delta Pride Catfish Inc., Harvest Select Catfish Inc., Heartland Catfish Company, Pride of the Pond, Simmons Farm Raised Catfish, Inc., and Southern Pride Catfish Company, LLC (collectively "Catfish Farmers"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

After the opening briefs were submitted, but before response briefs were filed, the court ruled on several issues to help expedite the disposition of the action by narrowing the focus of the litigation to issues that the court believed had sufficient merit to warrant a response from the Defendant. See QVD Food Co. v. United States, No. 09-00157 (USCIT Feb. 16, 2010) (order). This opinion addresses the remaining issues, which include: (1) QVD's challenge to Commerce's surrogate value selection of a

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

Bangladeshi fish producer's 2000-2001 financial statement to value whole live fish rather than the same producer's 2006-2007 financial statements; (2) Catfish Farmers' challenge to Commerce's surrogate value selection of Indonesian data for broken fish fillets rather than Bangladeshi data; (3) QVD's challenge to Commerce's handling of QVD's freight expenses on a net weight basis, which differed from prior reviews in which Commerce used QVD's reported gross weight; and (4) QVD's challenge to Commerce's alleged failure to make ministerial error corrections.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains determinations, findings, or conclusions of the U.S. Department of Commerce ("Commerce") unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Dupont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo

v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 10.3[1] (2d. ed. 2009). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2009).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005); Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1030 (Fed. Cir. 2007).  "[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001); see also Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359 (Fed. Cir. 2007) ("[W]e determine whether Commerce's statutory interpretation is entitled to deference pursuant to Chevron.").

## II.  Discussion

### A.  Surrogate Value Selection

When valuing the factors of production in a nonmarket economy proceeding, Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate market economy countries.  19 U.S.C. § 1677b(c)(1), (4).

Commerce's regulations provide that surrogate values should "normally" be publicly available and (other than labor costs) from a single surrogate country. 19 C.F.R. § 351.408(c) (2007).  When making its surrogate value selections (and when comparing and contrasting various data sets), Commerce considers "the quality, specificity, and contemporaneity of the available values." Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 73 Fed. Reg. 52,015, 52,020 (Dep't of Commerce Sept. 8, 2008) (prelim. results admin. review) ("Preliminary Results").  Commerce prefers data that reflects a broad market average, is publicly available, contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports. Certain Pneumatic Off-the-Road Tires from the People's Republic of China, 73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) (final LTFV determ.) and accompanying Issues and Decision Memorandum for Certain Pneumatic Off-the-Road Tires from the People's Republic of China, A-570-912 (July 7, 2008), cmt. 10 at 26, available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16156-1.pdf (last visited Sept. 1, 2010).

When reviewing substantial evidence issues involving Commerce's selection of the best available surrogate values, the court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d, 1323, 1327 (2006); see also CITIC Trading Co. v. United States, 27 CIT 356, 366 (2003) ("while the standard of review precludes the court from determining whether [Commerce's] choice of surrogate values was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices.").

### 1. Whole Live Fish

In the Preliminary Results Commerce used the 2006-2007 financial statements of Bangladeshi fish producer, Gachihata Aquaculture Farms, Ltd. ("Gachihata"), to set a surrogate value of 45 takas per kilogram for whole live pangas fish (a primary input for the subject merchandise). Prelim. Surr. Val. Mem. at 4, PD 106.[2] Commerce followed this same approach in the immediately preceding administrative review. See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 73 Fed. Reg. 15,479 (Dep't of Commerce Mar. 24, 2008) (final results admin. review), as amended, 73 Fed. Reg. 47,885 (Dep't of Commerce Aug. 15, 2008) ("Third Administrative Review") and accompanying Issues and Decision Memorandum for Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, A-552-801 (Mar. 17, 2008), cmt. 4 at 10-14, available at http://ia.ita.doc.gov/frn/summary/vietnam/E8-5889-1.pdf (last visited Sept. 1, 2010) ("Third Review Decision Memorandum").

For the Final Results Commerce changed course and used Gachihata's 2000-2001 financial statements to derive the surrogate value for whole live fish (inflating the 2000-2001 prices to the period of review), ultimately valuing whole live fish at 97.89 takas per kilogram. Final Surr. Val. Mem. at 2, PD 137. QVD challenges this surrogate value choice, arguing that the best available information to value whole live fish was the pricing information contained in the more contemporaneous 2006-2007 Gachihata financial statement that Commerce used in the Third Administrative Review. In selecting the 2000-2001 financial statements, Commerce explained:

---

[2] "PD__" refers to a document contained in the public administrative record.

    From the less-than-fair-value ("LTFV") investigation through the preliminary results of the third administrative review, the Department valued the whole fish input based on the sales value contained within the 2000-2001 Gachihata financial statements. In the final results of the third administrative review, the Department had both 2000-2001 and the 2006-2007 Gachihata financial statements on the record and relied on price[s] from the 2006-2007 Gachihata financial statements to value the whole fish input. In the final results of this second new shipper and fourth administrative reviews, we have the same two financial statements on the record. However, the record of the instant review also contains the Director's Report for the 2006-2007 Gachihata financial statement in addition to *pangas* fish pricing information from a paper submitted to the United Nations Food and Agriculture Organization ("FAO") regarding the economics of aquaculture in Bangladesh. For these final results, we have determined that the Gachihata 2000-2001 financial statement is the most appropriate basis for calculating the whole fish input surrogate value.

    Section 773(c)(1)(B) of the Act directs the Department to use "the best available information" from the appropriate market-economy country to value FOPs. In selecting the most appropriate surrogate values, the Department considers several factors including whether the surrogate value is: publicly available, contemporaneous with the POR, represents a broad market average, chosen from an approved surrogate country, are tax and duty-exclusive, and specific to the input. The Department's preference is to satisfy the breadth of the aforementioned selection criteria. However, where all the criteria cannot be satisfied, the Department will choose a surrogate value based on the best available information on the record.

    On February 3 and 10, 2009, the Department received the parties' case and rebuttal briefs, respectively, and on February 25, 2009, the Department held public and closed hearings for the administrative and new shipper reviews. In the briefs and during the hearings, parties presented their concerns with using the 2000-2001 and the 2006-2007 Gachihata financial statements as the basis for calculating the whole fish input surrogate value. Based on those presentations, the Department found it appropriate to make one final research effort for other potential whole fish surrogate values. On March 3, 2009, the Department placed on the record of this review *pangas* fish pricing information from a paper submitted to the United Nations FAO regarding the economics of aquaculture in Bangladesh.

> However, after considering the parties' March 5 comments on this new data, we agree with Petitioners that additional time is necessary for both the interested parties and the Department to consider the merits and detailed information contained within the FAO report. Specifically, while QVD argues that the FAO study is a high quality report that satisfies the Department's criteria for finding the best information available, Petitioners raise several questions regarding the report, including the timing of the data and supporting documentation. Therefore, we do not find it appropriate to use the FAO report to calculate the whole fish input surrogate value in these reviews. Notwithstanding this, we find that the data contained within the FAO report is deserving of consideration in future proceedings where the Department and interested parties have sufficient time to fully consider the data gathering methods, pricing information, etc. As such, we intend to place the FAO information on the record of future and on-going proceedings so that it can be fully considered as a potential basis for calculating the whole fish surrogate value in those segments.
> 
> We agree with Petitioners that the 2006-2007 Gachihata financial statements, in particular the Director's Report, illustrate numerous financial concerns that, when taken together, cast considerable doubt on the reliability of using it as the basis for calculating a whole fish input surrogate value (e.g., (a) the financial condition of the company had continued to deteriorate from prior years, (b) the Bangladeshi Government refused to provide financial assistance to overcome the company's losses despite Gachihata's pleas, (c) the company defaulted on bank loans due to cash flow, (d) the Bangladeshi SEC imposed penalties on the company directors for securities violations, (e) production of the company was at all-time lows because of shortage in working capital and operating losses).
> 
> Therefore, based on the concerns discussed above with the paper submitted to the United Nations FAO that the Department has had insufficient time to consider and concerns regarding the 2006-2007 Gachihata financial statements, we find that the 2000-2001 Gachihata financial statement is the best available information on the record of this review for calculating the whole fish surrogate value. While both financial statements are publicly available and specific to the input in question, the 2000-2001 financial statement contains more reliable pricing data. Although less contemporaneous that the 2006-2007 financial statement, consistent with our practice, we will inflate the value to the POR.

Decision Memorandum at 9-10.

QVD challenges Commerce's choice of the surrogate data for whole live fish as unreasonable given the available record information, arguing that the best available information for this surrogate is not the 2000-2001 inflated data, but the more contemporaneous 2006-2007 data.  More specifically, QVD argues:

> The record evidence in the instant case demonstrates that the price of whole pangasius fish in Bangladesh steadily declined for the six years between 2001 and 2007, as reflected by the whole fish price contained in the Gachihata financial statements for this period:
>
> 2000/2001:  68 takas/Kg.
> 2001/2002:  50 takas/Kg.
> 2002/2003:  49.7 takas/Kg.
> 2003/2004:  48 takas/Kg.
> 2006/2007:  45 takas/Kg.

QVD's Br. in Supp. of Pl.'s R. 56.2 Mot. for J. on Agency Rec. at 12 ("QVD Br."). The problem with this argument is that it does not fairly or accurately portray the record evidence for whole live fish that Commerce had to choose from during the administrative review.  QVD's argument ignores Commerce's previous determination that the whole live fish data in Gachihata's 2001-2002, 2002-2003, and 2003-2004 financial statements were unreliable because "the independent auditor's notes in those statements called into question Gachihata's internal control procedures and valuation of biological assets." Third Review Decision Memorandum at 13; see also Certain Frozen Fish Fillets from the Socialist Republic of Vietman, 71 Fed. Reg. 14,170 (Dep't of Commerce Mar. 21, 2006) (final results of first admin. review) and accompanying Issues and Decision Memorandum for the 1st Administrative Review of Certain Frozen Fish

Fillets from the Socialist Republic of Vietnam, A-552-801 (Mar. 13, 2006), cmt. 3A at 13-14, available at http://ia.ita.doc.gov/frn/summary/vietnam/E6-4070-1.pdf (last visited Sept. 1, 2010) (finding unreliable Gachihata's 2002-2003, 2003-2004 financial statements).

Nobody argued that Commerce should use the 2001-2002, 2002-2003, 2003-2004 data. It was understood to be unreliable. These considerations alter QVD's pricing table:

> 2000/2001:  68 takas/Kg.
> 2006/2007:  45 takas/Kg.

Commerce's analysis focused on the two relevant options: the 2000-2001 and 2006-2007 data. The 2000-2001 was reliable, but not contemporaneous. The 2006-2007 data was contemporaneous and had been used in the immediately prior review, but new record information, the Director's Report, cast a pall on the overall reliability of the 2006-2007 financial statements. Once Commerce determined that the 2006-2007 Gachihata financial statement was too unreliable from which to draw data, Commerce was left with the 2000-2001 data.

QVD argues that Commerce wrongly focused on Gachihata's poor financial condition, which QVD maintains is irrelevant to the price of pangas because of an auditor's statement that the company's books (and product sales) were market-based. QVD Br. 18. This is a fair observation. The 2001-2002, 2002-2003, and 2003-2004 financial statements were rejected because they contained a caveat about suspect internal control procedures and valuation of biological assets. The 2006-2007

statements did not have this caveat. This was an important reason Commerce selected the 2006-2007 data to derive the live fish surrogate values in the prior administrative review. The instant administrative review, however, presented Commerce with new evidence in the Director's Report that was not on the record in the prior review. After analyzing that evidence Commerce concluded that the 2006-2007 financial statements were too unreliable as a whole to derive surrogate data.

The court has reviewed the Director's Report. It portrays a very grim and unsettling picture of Gachihata's financial condition (see PD 78, Ex. 4), so much so that the court, like Commerce, would have been leery about relying on it to derive any surrogate data (and defend the reasonableness of that choice on judicial review). In short, the court cannot fault or find unreasonable Commerce's determination that Gachihata's 2006-2007 financial statements were too unreliable as a whole to derive surrogate values.

In the court's view, this is not a case in which the agency arbitrarily changed its mind from one review to the next, but of Commerce reasonably reaching a different result when confronted with an evolving administrative record, after wrestling with competing considerations of contemporaneity on the one hand, and quality and reliability on the other. Commerce knew that the 2000-2001 and 2006-2007 financial statements presented imperfect alternatives, finding it "appropriate to make one final research effort for other potential whole fish surrogate values." Decision Memorandum at 10. That effort uncovered additional information in the form of the UN FAO report, but Commerce also acknowledged (with the deadline for the final results only days

away) that there was insufficient time for Commerce and the parties to vet the new information. Id. Commerce was left with a choice between imperfect alternatives. Commerce exercised its prerogative to choose the best available information after applying its selection criteria, and Commerce's choice, as explained above, was reasonable given the administrative record. The court must therefore sustain Commerce's surrogate value selection for whole live fish.

### 2. Broken Fish Fillets

QVD reported broken fish fillets, a fish byproduct, as a factor of production. See QVD Sec. D Quest. Resp. at 4 and 18, PD 51. When calculating factors of production for subject merchandise, Commerce typically allows an offset for the value of the by-product. The record contained four potential surrogate values for the by-product of broken fish fillets.

Commerce placed on the record the 2007 World Trade Atlas Indonesian data for "Other Fish Meat of Marine Fish," which indicated an average value of Indonesian imports of broken fish fillets to be $2.34 per kilogram (170,827 kilograms for $400,552, rounded). Prelim. Surr. Val. Mem. at 8 & Att. 9, PD 106. Catfish Farmers submitted the 2003 UN COMTRADE data for Bangladeshi imports (HTS 0304.90.100 "Fish Meat Other Than Fillets"), which indicated a price of approximately $.25 per kilogram (372 kilograms of imports valued at $75 = $0.20), adjusted for inflation. See Catfish Farmers' Surr. Val. Subm. at 4 & Exh. 4-5, PD 74. Catfish Farmers also suggested, as an alternative, that Commerce select the 2003 World Trade Atlas Indonesian data used in the Third Administrative Review. Catfish Farmers' Admin. Case Br. at 32, PD 121.

Finally, QVD proposed a valuation of $3.13 per kilogram, taken from 2007 UN COMTRADE data for imports into Indonesia ("[f]ish meat & mince, except liver, roe & fillets, frozen"). QVD Surr. Val. Subm. at 4 & Exh. 5 (showing $3.1326), PD 75.

For the preliminary results Commerce selected the Indonesian 2007 World Trade Atlas data. Prel. Surr. Val. Mem. at 8, PD 106. Catfish Farmers challenged that selection in its administrative case brief:

> In the Preliminary Surrogate Value Memo, the Department stated that it relied upon Indonesian import statistics from HS#0304.90.100, "Other Fish Meat of Marine Fish," to derive a value for broken/trimmed fish meat of $2.34 per kilogram. However, the price of broken meat used in the Preliminary Results is so high that the Department cannot reasonably consider it to be suitable for use. In particular, Petitioners placed on the record the import data for broken meat from Bangladesh - the primary surrogate country - showing that the price was only $0.25 per kilogram. In other words, the price that the Department used from a secondary surrogate country was nearly ten times greater than the value from the primary surrogate country and the surrogate country from which it derived the whole live fish price, underscoring the unreliability of the Indonesian import price. Accordingly, the Department should use the Bangladeshi price in the Final Results because it is more reasonable than the price used in the Preliminary Results. Alternative [sic], the Department should use the Indonesian import price used in the 3rd Review Final Results.

Catfish Farmers' Admin. Case Br. at 31-32 (footnotes omitted). Catfish Farmers therefore tried to persuade Commerce as a factual matter that the Bangladeshi data was more reliable than the Indonesian data. The point heading in their brief makes this clear—"The Department Should Use a More Reliable Price for Broken Meat". Catfish Farmers' Admin. Case Br. at 31. Catfish Farmers even suggested, as an alternative, that Commerce should use other Indonesian data.

In the Final Results Commerce reasonably addressed Catfish Farmer's

Consol. Court No. 09-00157                                                                                           Page 14

factual argument about the reliability of the Indonesian data:

> Although Petitioners argue that the value of $2.34 per kilogram for broken fillets is high, we find that it is appropriate given the similarity between it and regular fish fillets. In the Section D Questionnaire Response ("SDQR"), QVD refers to the byproduct as "broken fillets." See SDQR at page 18 and supplemental section D questionnaire response at exhibits SD 16, 17, and 19. No party has disputed that the broken fillets are anything other than broken fillets. While broken fillets are not whole fillets, the Department finds that they do not fall into the category of fish meat other than fillets. As the Department finds the Indonesian data to be a more appropriate value to use than that of other fish meat other than fillets. Because the Indonesian data is contemporaneous with the POR, comes from a country that is economically comparable to Vietnam, and represents a broader market average because the value of sales from Indonesia is based on over $[4]00,000 in sales while the Bangladeshi value is based on total sales value of $75, the Department finds it to be the best information on the record. Moreover, the data source from which we derive the broken fillets surrogate value is an updated value of the same source used in the last review. The source value was from 2007, updating the value used in the Fish 3rd AR Results which was from 2003. Petitioners' effort to discredit the reliability of the 2007 value in favor of returning to the same source, but with values from 2003, is undermined by the fact that the value comes from the same source; it is simply a more contemporaneous value. Therefore, we will continue to use the Indonesian import statistics value used in the Preliminary Results.

Decision Memorandum at 11-12.

In their briefs before the court, Catfish Farmers raise two brand new arguments challenging Commerce's surrogate value selection. First, Catfish Farmers invoke the antidumping statute's requirement that Commerce "utilize, to the extent possible," surrogate values from countries that are not only (1) economically comparable to Vietnam, but that are also (2) "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Catfish Farmers contend for the first time that Commerce never determined Indonesia was a "significant producer of comparable merchandise," and

therefore, Commerce could not use any Indonesian data. Catfish Farmers' Reply Br. at 1; Catfish Farmers' Mem. In Supp. of R. 56.2 Mot. for J. on Agency Rec. at 17, 18 ("Catfish Farmers' Br."). This is a curious argument from a party that advocated using Indonesian data in the administrative proceeding. See Catfish Farmers' Admin. Case Br. at 32 ("Alternative [sic], the Department should use the Indonesian import price . . . ."). Catfish Farmers' other new argument is that Commerce violated an alleged administrative practice of using secondary surrogate country information only when primary surrogate country data is "unavailable," a condition Catfish Farmers allege was not satisfied here. Catfish Farmers' Br. at 17; Catfish Farmers' Reply Br. at 2-3.

Problematically, Catfish Farmers failed to include these arguments in its administrative case brief. As noted above, Catfish Farmers focused on a factual argument about the reliability between the Bangladeshi and Indonesian data sets. Catfish Farmers did not cite, mention, or discuss 19 U.S.C. § 1677b(c)(4) (which governs surrogate values and countries), nor did Catfish Farmers cite, mention, or discuss Commerce's own rules (19 C.F.R. § 351.408(c)(2)) or any administrative precedents addressing Commerce's use of information from a country other than the primary surrogate. Catfish Farmers' Admin. Case Br. at 31-32. The time to do so was in their administrative case brief because the issue of the lawfulness of utilizing Indonesian data as opposed to Bangladeshi data (as violative of the statute, regulation, or administrative practice) was squarely in play—Commerce used the Indonesian data in the Preliminary Results. The excerpt from Catfish Farmers' administrative case brief makes clear that Catfish Farmers failed to properly raise and argue those legal issues

before Commerce. See 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results . . . .").

When reviewing Commerce's antidumping determinations, the Court of International Trade requires litigants to exhaust administrative remedies "where appropriate." 28 U.S.C. § 2637(d). "This form of non-jurisdictional exhaustion is generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review—advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 89 (2006)). By failing to raise their arguments about the legal standards governing utilization of secondary surrogate country information at the administrative level, Catfish Farmers deprived Commerce of the opportunity to address those issues and make a "determination, finding, or conclusion." 19 U.S.C. § 1516a(b)(1). As a result, Commerce did not have the opportunity to "apply its expertise," potentially "rectify administrative mistakes," or "compile a record adequate for judicial review." Carpenter, 30 CIT at 1374-75, 452 F. Supp. 2d at 1346. Therefore, the court will not consider Catfish Farmers' new arguments regarding Commerce's surrogate value selection for broken fish fillets. Instead, the court will sustain Commerce's decision.

### B. QVD's Freight Expense

In the Final Results Commerce acknowledged and corrected an error in its

Consol. Court No. 09-00157                                                                                         Page 17

margin calculation for QVD.  Catfish Farmers argued, and Commerce agreed, that adjusting QVD's constructed export price with a gross weight international movement expense, when all other adjustments were made upon a net weight basis, distorted the calculation.  Decision Memorandum at 15-16.

Commerce offered the straightforward, common sense rationale "that there [was] an inconsistent unit of measure that would generate a distortion if [Commerce] deduct[ed] freight expenses from the unit price when these two components [were] not on the same basis."  Decision Memorandum at 16, PD 136.  Commerce further explained that "[t]o correctly calculate the freight costs, [it] should deduct the freight expenses based on a net-weight basis similar to the weight basis for the unit price and the other price adjustments and movement expenses."  Id.  Accordingly, Commerce adjusted QVD's international freight expenses to a consistent net-weight basis.  Id.

QVD challenges Commerce's correction, arguing that Commerce's explanation is a conclusory statement.  QVD Br. at 29.  The court disagrees.  Commerce's statement that it would use freight expenses calculated on the same unit basis is not, as QVD suggests, an unreasonable conclusory statement, but a simple, lucid, common sense explanation for what appeared to be a necessary correction.  The onus is on QVD to explain to the court why Commerce's correction fails to produce a more accurate dumping margin than the prior method.  This QVD has failed to do.  Commerce's adjustment to QVD's freight expenses must therefore be sustained.

### C. Alleged Ministerial Errors

To compute the financial ratios for SG&A and overhead expenses for the factors-

Consol. Court No. 09-00157                                                                    Page 18

of-production, normal-value calculation, Commerce initially used the calculated average financial ratios from the 2006-2007 financial statements of Apex Foods Ltd. ("Apex") and Gemini ("Gemini"). Prel. Surr. Val. Mem. at 10, PD 106. In response both Catfish Farmers and QVD focused upon the issue of which financial statements should be used to calculate the surrogate financial ratios. See Catfish Farmers' Admin. Case Br. at 18-31, PD 121; QVD Admin. Rebuttal Br. at 14-21, PD 122. Neither party argued that adjustments should be made to the financial ratio calculations. In the Final Results Commerce continued to use—as the surrogate values for the SG&A ratio and overhead—the averages of the calculated ratios from the 2006-2007 financial statements of Apex and Gemini. Final Surr. Val. Mem., Att. 1, PD 137.

After Commerce issued the Final Results, QVD for the first time claimed that Commerce had made a ministerial error by allegedly failing to adjust the SG&A and overhead financial ratios to exclude certain expenses—laboratory testing, sales promotion, sales commissions, and bank charges—from the SG&A financial ratio calculation, thereby allegedly double-counting them. QVD Minis. Error Alleg. at 4-7, PD 142. Commerce concluded that QVD's allegation was not ministerial and denied the claim. Analysis of Minis. Error Alleg. Mem. at 8, PD 145.

QVD challenges Commerce's denial of the ministerial error allegation. QVD Br. 39. A ministerial error is "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication or the like, and any other similar type of unintentional error which the Secretary considers ministerial." 19 C.F.R. § 351.224(f). Importantly, Commerce included the disputed expenses in their

respective ratios in the preliminary results and QVD raised no objections during the administrative proceeding to cause Commerce to reconsider its calculation of these ratios. See QVD's Case and Rebuttal Briefs, PD 119; PD 122.

Commerce properly concluded that QVD's claim regarding the surrogate financial ratios was a substantive challenge to Commerce's assignment of certain expenses to the surrogate ratio calculations. There was nothing unintentional or inadvertent about Commerce's treatment of these expenses. A determination of whether such expenses should or should not be included in the financial ratio expenses is a complex issue and can involve, among other things, an analysis of whether there is sufficient record evidence to demonstrate that the surrogate producer's basis for the expense exactly correlates with the NME producer basis for the expenses. See Shanghai Eswell Enter. Co. v. United States, 31 CIT 1570, 1579-81 (2007), opinion after remand, 32 CIT ___, ___, (2008), 2008 WL 4921375, at *6 (Nov. 18, 2008), aff'd without opinion, 350 Fed. Appx. 473 (Fed. Cir. 2009). Thus, although QVD suggests that these alleged "errors" are ministerial, they are not. Accordingly, Commerce's denial of QVD's request for ministerial error corrections must be sustained.

### III. Conclusion

For all of the foregoing reasons, the court will enter judgment sustaining the Final Results.

                                                                  /s/ Leo M. Gordon
                                                           Judge Leo M. Gordon

Dated:    September 1, 2010
             New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QVD FOOD CO., LTD.,<br><br>                    Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>                  Defendant. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 09-00157 |

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; it is hereby

**ORDERED** that the final results of the administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam, <u>Certain Frozen Fish Fillets from the Socialist Republic of Vietnam</u>, 74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17, 2009) (final results admin. review), <u>as amended</u>, 74 Fed. Reg. 17,816 (Dep't of Commerce Apr. 17, 2009) (amended final results admin. review), are sustained; and it is further

**ORDERED** that the subject entries enjoined in this action, <u>see</u> <u>Catfish Farmers of America v. United States</u>, Court No. 09-00158 (USCIT June. 1, 2009) (order granting consent motion for preliminary injunction), must be liquidated in accordance with the final court decision, including all appeals, as provided for in Section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2006).

                                                                      /s/ Leo M. Gordon      
                                                                     Judge Leo M. Gordon

Dated:      September 1, 2010
              New York, New York